IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF GEORGIA
MACON DIVISION

| | |
|---|---|
| JAQUAISHALA CHAMPION, | |
| Plaintiff, | Civil Action No.: |
| v. | |
| MANNINGTON MILLS INC., | 5:21-cv-00012 |
| Defendant. | **JURY TRIAL DEMANDED** |

## COMPLAINT

COMES NOW Plaintiff JaQuaishala Champion, and brings this action pursuant to the Americans with Disabilities Act of 1990, 42 U.S.C. § 12101, *et seq.*, as amended. Plaintiff alleges that Defendant Mannington Mills Inc. subjected Plaintiff to discrimination based on Plaintiff's association with an individual with a disability, respectfully shows the Court as follows:

### JURISDICTION AND VENUE

1.

This Court has original jurisdiction over the subject matter of this civil action pursuant to 28 U.S.C. § 1331. Moreover, this Court has jurisdiction over this matter as Plaintiff has exhausted her administrative remedies before the Equal Employment Opportunity Commission, as alleged herein.

2.

Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391 because Plaintiff was employed, and the events underlying this action, occurred in Madison, Morgan County, Georgia, which is located within this judicial district.

## PARTIES

3.

Plaintiff Jaquaishala Champion (hereinafter, "Plaintiff" or "Champion") is a citizen of the United States and a resident of Georgia. At all times relevant to this suit, Ms. Champion was employed with Defendant Mannington Mills Inc.

4.

At all relevant times, Ms. Champion was considered a covered, non-exempt employee under the Americans with Disabilities Act.

5.

Defendant Mannington Mills Inc. (hereinafter, "Defendant") is a foreign profit corporation, incorporated under the laws of the State of New Jersey.

6.

Defendant's principal office address is 75 Mannington Mills Road, Salem, New Jersey 08079, and Defendant may be served with process through its registered agent, Corporation Service Company, at 40 Technology Parkway South, Suite 300, Norcross, Gwinnett County, Georgia 30092.

7.

Defendant is a private employer engaged in interstate commerce, with an annual revenue in excess of $500,000.00. Defendant has more than fifteen employees who have worked for at least twenty calendar weeks in 2020 and preceding years.

8.

Defendant is a covered entity and employer within the meaning of the Americans with Disabilities Act.

## STATEMENT OF FACTS

9.

Plaintiff hereby pleads and incorporates by reference all of the allegations contained in Paragraphs 1 through 8, as if the same were set forth herein.

10.

Ms. Champion began her employment with Defendant in March 2017, where she worked as a Quality Assurance Technician at Defendant's Madison, Georgia manufacturing facility.

11.

Ms. Champion met the qualifications for her position, she was experienced in her role, and she had spent more than three years satisfactorily performing her duties.

12.

Prior to Defendant's termination of Ms. Champion, she had never been subjected to disciplinary action.

13.

At all relevant times, Ms. Champion's performance was exemplary.

14.

Ms. Champion's adult brother, Alvin Evans (hereinafter, "Evans"), was also employed with Defendant as an Associate at its Madison, Georgia manufacturing facility.

15.

Ms. Champion and Mr. Evans neither lived in the same household, nor even in the same county.

16.

Ms. Champion and Mr. Evans were not assigned to the same department or work areas.

17.

Nonetheless, it was common for Ms. Champion and Mr. Evans to see one another at work. These interactions where generally very brief and included times in which Ms. Champion and Mr. Evans had short conversations in the parking lot, saw one another moving about Defendant's facility, and other times when Mr. Evans would go to his sister's office to greet her.

18.

On the evening of March 26, 2020, Mr. Evans began to feel ill while working his shift and he was sent to the emergency room. Mr. Evan's treating physicians found that Mr. Evans had symptoms consistent with coronavirus disease (or COVID-19), and a sample was taken for viral testing.

19.

At approximately 9:00 pm that evening, several hours after Ms. Champion had completed her shift and returned home for the day, she received a call from her brother who advised Ms. Champion that he was ill and was at the hospital.

20.

Before discharging Mr. Evans, his emergency medicine provider ordered Mr. Evans to quarantine until his test results were returned, which were not expected until several days later.

21.

On March 26th or March 27th, Ms. Champion's supervisor, Michael Fowler (hereinafter, "Fowler") asked her several questions about her interactions with her brother. Ms. Champion told Mr. Fowler that she had spoken to her brother on the day that he got sick, but that she had not been close to him.

22.

On or about March 30, 2020, Mr. Evans received the results from his test, which confirmed that he was positive for coronavirus disease.

23.

Before Ms. Champion went to work, she received a telephone call from Defendant's Director of Human Resources, Dawn Simmons (hereinafter, "Simmons"). Ms. Simmons asked Ms. Champion if she had been at her brother's workstation on the day that he got sick, which Ms. Champion denied.

24.

Ms. Simmons demanded to know whether Ms. Champion had been around her brother, either at work or otherwise, around the time he became symptomatic. Ms. Champion did not recall interacting with her brother; so she denied being in close contact and explained that the two did not live together.

25.

Ms. Champion also confirmed to Ms. Simmons that Mr. Evans had not visited Ms. Champion's office on the day at issue.

26.

After this conversation, Ms. Champion clocked-in at work and began her shift.

27.

Later that day, Mr. Fowler approached Ms. Champion and told her that three employees had reported seeing Ms. Champion and Mr. Evans speaking in the parking lot on March 26th.

28.

At that point, Ms. Champion recalled the brief encounter and explained that she had spoken to her brother in the parking lot on March 26th.

29.

Mr. Fowler told Ms. Champion that the three other employees had reported that Ms. Champion was in Mr. Evans vehicle, which Ms. Champion denied.

30.

Around 5:00 pm on March 26th, Ms. Champion had been sitting in her vehicle at the end of her shift. Mr. Evans arrived for work around the same time and, upon seeing his sister, he motioned for Ms. Champion to approach his vehicle. Ms. Champion walked over to Mr. Evans' truck and had a brief conversation with him about how Defendant had stopped making matching contributions to the employee retirement plan. This conversation lasted approximately four minutes or less.

31.

Ms. Champion had forgotten about this conversation as it was brief and unremarkable, and she forgot about it after learning of her brother's illness, which was far more serious.

32.

As soon as Ms. Champion remembered this conversation, she apologize and explained to Mr. Fowler what had occurred – that she had approached but stood several feet away from Mr. Evan's vehicle and that Mr. Evans had remained in his own vehicle during the short conversation.

33.

Mr. Fowler immediately sent Ms. Champion home and told her to quarantine for fourteen days.

34.

As Ms. Champion was leaving, Mr. Fowler treated Ms. Champion as though she were diseased, and Ms. Champion felt like she had been discarded.

35.

Meanwhile, Defendant sent home several other employees who had actually worked in close proximity to Mr. Evans on the March 26th shift.  These employees were invited to return to their position after quarantine and were either allowed to telework or were paid for their time in quarantine.

36.

However, Defendant failed to send all employees with closer contacts than Ms. Champion home.  Specifically, Shaquala Harris, an Associate who Defendant knew had worked on the March 26th shift with Mr. Evans, was invited to return immediately to her position and work on-site. Moreover, Ms. Harris was assigned overtime shifts, which are prized by employees because of the higher rate of compensation.

37.

On March 31st, Ms. Champion received a telephone call from HR Director Simmons.  Ms. Simmons erroneously stated that Ms. Champion had said that she had not been around her brother. When Ms. Champion explained that she had forgotten about her brief conversation in the parking lot, Ms. Simmons accused Ms. Champion of dishonesty and told Ms. Champion that she could have infected other employees.

38.

Ms. Simmons suggested that Ms. Champion should have either recalled the conversation or intentionally lied about her interactions because it was Ms. Champion's brother who had been diagnosed with coronavirus disease and with whom she had been accused of interacting.

39.

On April 1, 2020, Ms. Simmons called Ms. Champion once again and told Ms. Champion that she was being terminated from her position.

40.

On the same day, Defendant issued a press release about Mr. Evans, advising that all individuals in close contact had been identified and were self-isolating.

41.

The press release also explained that Defendant had relaxed its attendance and sick leave policies to ease the burden on its associates.

42.

Defendant did not conduct an investigation into whether employees who were not related to Mr. Evans had any close contacts with him on the day he became symptomatic.

43.

Defendant did not accuse any employee, who was not related to Mr. Evans, of dishonesty if they had initially forgotten about an incidental interaction with Mr. Evans on the day at issue.

44.

Defendant's employees, who were not related to Mr. Evans but had close contact with him, were permitted to work from home or take paid leave while in quarantine.

45.

Defendant's employees, who were not related to Mr. Evans but had close contact with him, were not treated as though they were diseased or discarded.

46.

Some of Defendant's employees, who were not related to Mr. Evans but had close contact with him, were not only permitted to work on-site, but were assigned shifts with a higher rate of pay.

47.

Although Ms. Champion is related to a person who has been diagnosed with coronavirus disease, she did not live in the same household as the infected person, she was not caring for the infected person, she was not within six feet of the infected person, and she had not been in direct contact with secretions from the infected person for any amount of time.

48.

As a result, Ms. Champion was not in "close contact" with Mr. Evans around the time that he was infected with coronavirus disease, as defined by the Centers for Disease Control and Prevention.

Procedural/Administrative Background

49.

Ms. Champion submitted her Charge of Discrimination to the Equal Employment Opportunity Commission (hereinafter, "EEOC") on May 13, 2020, and it was assigned Charge Number 410-2020-04948.

50.

The EEOC issued a Dismissal and Notice of Rights dated October 9, 2020. While said Dismissal indicates that it was mailed to Ms. Champion, she has not received any copy by mail. Ms. Champion received the Dismissal and Notice of Rights, through counsel, on October 14, 2020.

51.

Ms. Champion has exhausted her administrative remedies and she is filing the instant action within ninety days of her receipt, through counsel, of the EEOC's issuance of a Dismissal and Notice of Rights.

## COUNT I:
## DISCRIMINATION BASED ON ASSOCIATION
## IN VIOLATION OF AMERICANS WITH DISABILITIES ACT

52.

Plaintiff hereby pleads and incorporates by reference all of the allegations contained in Paragraphs 1 through 51, as if the same were set forth herein.

53.

The Americans with Disabilities Act prohibits covered entities from "discriminating against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a).

54.

The term "discriminate against a qualified individual on the basis of disability" includes "excluding or otherwise denying equal jobs or benefits to a qualified individual because of the known disability of an individual with whom the qualified individual is known to have a relationship or association." 42 U.S.C. § 12112(b).

55.

As alleged herein, Defendant and Plaintiff are a covered, non-exempt employer and employee under the Americans with Disabilities Act, respectively. *See* 42 U.S.C. § 12111.

56.

Plaintiff's brother became symptomatic on March 26, 2020, and was later diagnosed with coronavirus disease, or COVID-19.

57.

Coronavirus disease, or COVID-19, is a physical impairment arising from a contagious virus. Infection with coronavirus disease causes an individual to develop symptoms that can impact the respiratory system, immune system, and nervous system, and some people develop acute respiratory distress syndrome. As a result, infection with coronavirus can substantially limit several major life activities such as breathing, mobility, performing manual tasks, smelling and tasting, and the disease makes it difficult to accomplish other activities of daily living.

58.

As a result, coronavirus disease, or COVID-19, is considered a disability under the Americans with Disabilities Act. 42 U.S.C. § 12102(1).

59.

Defendant was aware that Plaintiff's brother had said disability.

60.

As alleged herein, Plaintiff was qualified for her position at the time of her termination.

61.

Previously, throughout her three-year tenure in her position, Plaintiff's performance had been exemplary, and she had not been subject to any discipline.

62.

At the time of her termination, Plaintiff had not violated any of Defendant's policies, and Defendant did not have legitimate cause for Plaintiff's termination.

63.

Defendant terminated Plaintiff from her position on April 1, 2020.

64.

At the time of her termination, Defendant was aware that Plaintiff was the sibling of the individual with a disability and, thus, had a relationship and/or association with the individual with a disability.

65.

Defendant did not conduct an investigation into its employees who were not related to the person with a disability but were suspected to have possible close contact with said person.

66.

Defendant permitted telework or paid leave for its employees who were not related to the person with a disability but were suspected to have possible close contact with said person.

67.

Defendant permitted a return to work after quarantine for employees who were not related to the person with a disability but were suspected to have possible close contact with said person.

68.

Defendant allowed, at least, one employee, who was not related to the person with a disability but was known by Defendant to have had close contact with said person, to continue working and even assigned her to a shift with a higher rate of compensation.

69.

Defendant did not accuse any employee, who was not related to the person with a disability but had close contact with said person, of being dishonest if they initially forgot about an incidental interaction with said person with a disability.

70.

Defendant did not treat any employee, who was not related to the person with a disability but had close contact with said person, less favorably or as though they were diseased or discarded.

71.

Defendant did not terminate any employee, who was not related to the person with a disability but had close contact with said person.

72.

Defendant treated Plaintiff less favorably and terminated her employment solely because of Plaintiff's relationship and association with an individual with a disability.

73.

Plaintiff has been injured by Defendant's discrimination of Plaintiff due to her association with an individual with a disability, and Plaintiff is entitled to all damages allowed under the Americans with Disabilities Act, including an award of back pay, reinstatement and/or front pay, compensatory and punitive damages in the amount of $300,000, and attorney's fees and costs of litigation, all in an amount to be proven at trial.

**JURY DEMAND**

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff demands trial by jury on all issues so triable.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Jaquaishala Champion respectfully prays for the following relief:

1)  That Summons and Process be issued to Defendant Mannington Mills Inc., and that said Defendant be served as provided by law;

2)  That this matter be tried before a jury;

3)  That judgment be awarded for and in favor of Plaintiff and against Defendant on Count I for discrimination based on association with a person with a disability, and grant Plaintiff all relief allowable under the Americans With Disabilities Act;

4)  For such other relief as this Court shall deem just and proper.

Respectfully submitted, this 7th day of January, 2021.

                                              KENNETH E. BARTON III
                                              Georgia Bar No. 301171
                                              JOHN M. MCCALL
                                              Georgia Bar No. 778954
                                              *Attorneys for Plaintiff*

COOPER, BARTON & COOPER, LLP
170 College Street
Macon, Georgia 31201
(478) 841-9007 telephone
(478) 841-9002 facsimile
keb@cooperbarton.com
jmm@cooperbarton.com