IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
MACON DIVISION

| | |
|---|---|
| JAQUAISHALA CHAMPION,<br><br>*Plaintiff,*<br><br>v.<br><br>MANNINGTON MILLS, INC.,<br><br>*Defendant.* | CIVIL ACTION NO.<br>5:21-cv-00012-TES |

**ORDER GRANTING MANNINGTON MILLS' MOTION TO DISMISS**

Plaintiff Jaquaishala Champion ("Champion") sued her employer, Defendant Mannington Mills ("Mannington"), for discrimination under the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101, *et seq*, based on her association with her brother, who tested positive for COVID-19. [Doc. 1]. Mannington filed a Motion to Dismiss [Doc. 4], arguing that Champion fails to state a claim because she fails to allege that her brother was "disabled" as that term is defined by the ADA. [Doc. 4-1]. The motion has been fully briefed and is ripe for the Court's consideration.

## BACKGROUND

Champion worked as a Quality Assurance Technician at Mannington's Madison, Georgia, facility. [Doc. 1, ¶ 10]. Her brother, Alvin Evans ("Evans"), worked at the same facility. [*Id.* at ¶ 14]. Around 5:00 p.m. on March 26, 2020, Champion had a conversation with Evans in the parking lot following her shift, but before he started his shift. [*Id.* at ¶

30]. During their roughly four-minute conversation, Evans sat in his vehicle and Champion stood several feet away. [*Id.* at ¶¶ 30, 32]. About four hours later, Evans starting feeling ill and Mannington sent him to the emergency room where he was tested for COVID-19. [*Id.* at ¶ 19]. On March 30, 2020, Evans' test came back positive. [*Id.* at ¶ 22]. Before Champion came to work that day, Director of Human Resources Dawn Simmons asked her if she went to Evans' workstation on the day he got sick, and she said that she had not. [*Id.* at ¶ 23]. Simmons also asked Champion if she had been around her brother at work or outside of work around the time he became symptomatic, and she said no. [*Id.* at ¶ 24]. Champion forgot about the parking lot conversation with her brother and did not tell Simmons about it at this time. Champion went on to work her shift. [*Id.* at ¶ 26].

Michael Fowler, Champion's supervisor, confronted Champion and told her that three of her fellow employees told him that they saw her speaking to her brother in the parking lot on March 26, and that they saw her in the car with her brother. [*Id.* at ¶¶ 27–29]. After Fowler questioned her, she recalled the parking lot encounter with her brother, told him about it, and even apologized for forgetting about it earlier. She also denied ever being in Evans' vehicle. [*Id.* at ¶¶ 28, 31, 32]. Fowler told Champion to go home and quarantine for 14 days. [*Id.* at ¶ 33]. Champion alleges that Fowler made her feel "diseased" and "discarded." [*Id.* at ¶ 34].

The next day, March 31, Simmons phoned Champion and accused her of dishonesty because she did not disclose the parking-lot conversation with her brother when initially asked. [*Id.* at ¶ 37]. Simmons expected Champion to have remembered the encounter because it was her own brother. [*Id.* at ¶ 38]. Simmons told Champion she "could have infected other employees." [*Id.* at ¶ 37]. The next day, April 1, Simmons again called Champion and told her that she was being terminated from her position. [*Id.* at ¶ 39].

Champion alleges that Mannington did not investigate whether any of the other employees had close contact with Evans; they only investigated her because she was related to him. [*Id.* at ¶42]. Champion also alleges that she was the only employee accused of dishonesty upon initially forgetting about her encounter with Evans in the parking lot. [*Id.* at ¶43]. Champion alleges that of all the employees who had contact with Evans, she was the only one not permitted to work from home, take paid leave while in quarantine, or continue working on-site even at higher rates of pay, and was the only employee made to feel "diseased" and "discarded." [*Id.* at ¶¶ 44–45]. At bottom, Champion alleges that she was never in "close contact" with her COVID-positive brother as the Center for Disease Control defined it at the time he was infected. [*Id.* at ¶48]. Champion submitted a charge of discrimination to the EEOC, and the EEOC issued her a Notice of Rights. [*Id.* at ¶¶49–51].

## DISCUSSION

### A. Motion to Dismiss Standard

When ruling on a Rule 12(b)(6) motion, district courts must accept the facts set forth in the complaint as true. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 572 (2007). A complaint survives a motion to dismiss if it alleges sufficient factual matter (accepted as true) that states a claim for relief that is plausible on its face. *McCullough v. Finley*, 907 F.3d 1324, 1333 (11th Cir. 2018) (citing *Ashcroft v. Iqbal*, 556 U.S. 662, 678–79 (2009)). In fact, a well-pled complaint "may proceed even if it strikes a savvy judge that actual proof of those facts is improbable, and that a recovery is very remote and unlikely." *Twombly*, 550 U.S. at 556 (citations omitted).

Although Federal Rule of Civil Procedure 8 does not require detailed factual allegations, it does require "more than [ ] unadorned, the-defendant-unlawfully-harmed-me accusation[s]." *McCullough*, 907 F.3d at 1333 (citation omitted). To decide whether a complaint survives a motion to dismiss, district courts use a two-step framework. *Id.* The first step is to identify the allegations that are "no more than mere conclusions." *Id.* (quoting *Iqbal*, 556 U.S. at 679). "Conclusory allegations are not entitled to the assumption of truth." *Id.* (citation omitted). After disregarding the conclusory allegations, the second step is to "assume any remaining factual allegations are true and determine whether those factual allegations 'plausibly give rise to an entitlement to relief.'" *Id.* (quoting *Iqbal*, 556 U.S. at 679).

Furthermore, a complaint attacked by a 12(b)(6) motion must be dismissed if it fails to "give the defendant fair notice of what the . . . claim is and the grounds upon which it rests." *Twombly*, 550 U.S. at 555. "A plaintiff must plead more than labels and conclusions or a formulaic recitation of the elements of a cause of action." *McCullough*, 907 F.3d at 1333; *see also Twombly*, 550 U.S. at 555. "To be sure, a plaintiff may use legal conclusions to structure his complaint, but legal conclusions 'must be supported by factual allegations.'" *McCullough*, 907 F.3d at 1333 (quoting *Iqbal*, 556 U.S. at 679). While courts, in ruling on a motion to dismiss, must take all the factual allegations in the complaint as true; they are not bound to accept a legal conclusion couched as a factual allegation. *Iqbal*, 556 U.S. at 678. Courts must "identify conclusory allegations and then discard them—not 'on the ground that they are unrealistic or nonsensical' but because their conclusory nature 'disentitles them to the presumption of truth.'" *McCullough*, 907 F.3d at 1333 (quoting *Iqbal*, 556 U.S. at 681).

The issue to be decided when considering a motion to dismiss is not whether the claimant will ultimately prevail, but "whether the claimant is entitled to offer evidence to support the claims." *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974), *overruled on other grounds* by *Davis v. Scheuer*, 468 U.S. 183 (1984). The factual allegations in a complaint "must be enough to raise a right to relief above the speculative level" and cannot "merely create[] a suspicion of a legally cognizable right of action." *Twombly*, 550 U.S. at 545, 555. Finally, complaints that tender "'naked assertion[s]' devoid of 'further factual

enhancement'" will not survive against a motion to dismiss. *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 557). Stated differently, the complaint must allege enough facts "to raise a reasonable expectation that discovery will reveal evidence" supporting a claim. *Twombly*, 550 U.S. at 556.

### B.  Champion's Claim for Association Discrimination

Whether Champion has stated a claim under the ADA depends entirely on the answer to one question: was her brother's COVID-19 infection a "disability" as that term is defined in 42 U.S.C. § 12102(1)?

The ADA prohibits association discrimination. *See* 42 U.S.C. § 12112(b)(4). Specifically, it is unlawful to "exclude[e] or otherwise deny[] equal jobs or benefits to a qualified individual because of the known disability of an individual with whom the qualified individual is known to have a relationship." *Id*. The ADA considers an individual to have a disability if that person has "a physical or mental impairment that substantially limits one or more major life activities of such individual;" "a record of such an impairment;" or is "regarded as having such an impairment (as described in paragraph (3))." 42 U.S.C. § 12102(1). The Court will consider whether Champion's allegations regarding Evans' COVID-19 infection satisfy any of those three grounds.

Champion alleges that Evans, her brother, became ill at work on March 26, 2020, went to the emergency room, took a COVID-19 test, and quarantined as ordered by his medical provider while awaiting his test results, which came back positive four days

later. [Doc. 1, ¶¶ 18–22, 56 ("Plaintiff's brother became symptomatic on March 26, 2020, and was later diagnosed with coronavirus disease, or COVID-19.")].

Champion also alleges information about COVID-19 generally. Specifically, she alleges:

> Coronavirus disease, or COVID-19, is a physical impairment arising from a contagious virus. Infection with coronavirus disease causes an individual to develop symptoms that *can* impact the respiratory system, immune system, and nervous system, and *some people* develop acute respiratory distress syndrome. As a result, infection with coronavirus *can* substantially limit several major life activities such as breathing, mobility, performing manual tasks, smelling and tasting, and the disease makes it difficult to accomplish other activities of daily living.

[*Id.* at ¶ 57] (emphasis added). Thus, contends Champion, "COVID-19[] is considered a disability under the Americans with Disabilities Act. 42 U.S.C. § 12102(1)." [*Id.* at ¶ 58]. Champion argues that it "should be sufficient [at the motion-to-dismiss stage] to allege that Mr. Evans suffered from COVID-19," and it is unnecessary to "intricately describe each of the effects COVID-19 had on Mr. Evans." [Doc. 10, p. 8]. The Court has little trouble disagreeing with Champion's legally-flawed position that *anyone* alleged to have COVID-19 is "disabled" as that term is defined by the ADA. *See Hilburn v. Murate Electronics of North America, Inc.*, 181 F.3d 1220, 1227–28 (11th Cir. 1999) (explaining that an allegation that a person has "heart disease," without explaining specifically how the person's heart disease substantially limits any of her major life activities, is insufficient). Whether someone is disabled depends on whether they satisfy any of the requirements in § 12102(1). And § 12102(1) does not enumerate various diseases or disabilities; it

7

enumerates a person-by-person test that must be applied to an individual regardless of any specific diagnosis. A plaintiff "must allege factual matter explaining *how* the alleged ailment substantially limits a major life activity." *Garcia v. Goodwill Industries of South Florida, Inc.*, No. 18-25042-CIV-MORENO, 2019 WL 6052814, at *2 (S.D. Fla. Nov. 15, 2019). The Court agrees that an "intricate" description of Evans' condition is not necessary, but not alleging a single symptom that Evans suffered showing why he was physically or mentally unable to work falls well short.

Champion alleges no facts about whether Evans suffered from any of the above-mentioned COVID-19 symptoms. [Doc. 4-1, pp. 6–7]. She alleges that he became sick and had to go to the emergency room on March 26 and was subsequently diagnosed with COVID-19—and nothing more. While Champion alleges that COVID-19 "*can* impact the respiratory system, immune system, and nervous system, and *some people* develop acute respiratory distress syndrome"—she never alleges that Evans experienced any of these conditions. [*Id.* at ¶ 57 (emphasis added)]. While Champion alleges that "coronavirus *can* substantially limit several major life activities"—she does not successfully allege that coronavirus substantially limited any of Evans' life activities. [*Id.* (emphasis added)].

Champion argues that Evans' condition falls within the "physical or mental impairment that substantially limits one or more major life activities of such individual" prong of § 12102(1). [Doc. 10, p. 6]. The ADA lists "caring for oneself, performing

manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and working" as examples of the "major life activities" referred to in § 12102(1). 42 U.S.C. § 12102(2)(A). Further, "[a]n impairment is a disability within the meaning of this section if it substantially limits the ability of an individual to perform a major life activity as compared to most people in the general population." 29 C.F.R. § 1630.2(j)(1)(ii). Champion alleges that Evans left during a work shift to go to the emergency room when he began experiencing COVID symptoms. [Doc. 1, ¶¶ 18, 56]. This, argues Champion, shows that his ability to work—which is a major life activity under the ADA—was substantially limited and, therefore, Evans is a disabled person for ADA purposes. [Doc. 10, pp. 6–8]. Champion makes a similar argument that Evans was substantially limited in his ability to communicate since he was diagnosed with COVID and unable to maintain in-person communications. [Id.].

The Court disagrees. First, Champion's argument that Evans was substantially limited in his ability to work falls short. While she alleged that Evans had to miss several days of work due to his COVID-19 infection, that bare allegation, without more, does not rise to the level of a "disability" under the ADA. If Champion is correct, then employers across the nation will be shocked to learn that if any of their employees are sick for just a few days, then those employees are "disabled" and now protected by the ADA. Champion never alleges that her brother could not work from home, or that he

was unable to work any type of job due to his infection. Further, even if Champion had alleged that Evans was unable to work any job while quarantining, she certainly did not allege that the limitation was because complications from his particular bout with COVID-19 required it. In other words, the best that Champion can allege is that her brother caught COVID-19 and Mannington did not allow him to work because of the resulting mandatory quarantine, something that employees with the disease and those without—*i.e.*, those who were merely potentially exposed to COVID-19—endured. Champion offered the Court nothing to allow it to determine if Evans couldn't work because of the disease itself, *i.e.*, he was on a ventilator or in the hospital, or because Mannington followed the CDC guidance and quarantined those who tested positive, regardless of symptoms or the disease's impact on employees' actual ability to do their job.

Second, Champion's argument that Evans was substantially limited in his ability to communicate also falls short. Champion points to no law that provides "in-person communication" is a major life activity. To believe otherwise would mean that any of the millions of Americans who quarantined, including those without COVID-19, those infected but asymptomatic, and those who were seriously ill, were suddenly "disabled" under the ADA.

Finally, Champion fails to succeed under the "regarded as" prong of 42 U.S.C. § 12102(1). First, an association-discrimination claim like Champion's cannot be based on

a plaintiff's association with a person merely regarded as disabled. *See E.E.O.C. v. STME, LLC*, 309 F. Supp. 3d 1207, 1215 (M.D. Fla. Feb. 15, 2018), *aff'd* 938 F.3d 1305 (11th Cir. 2019) ("The ADA does not establish a cause of action for discrimination against an individual who associates with people who are merely *regarded as* disabled."). Champion disagrees, arguing that the court got it wrong in *STME* because the decision is contrary to the plain text of the ADA. [Doc. 10, p. 9–10]. While "regarded as" is a basis upon which one can be disabled under the ADA, 42 U.S.C. § 12102(1), association discrimination consists of discrimination based on one's association with a person who has a "*known* disability." 42 U.S.C. § 12112(b)(4) (emphasis added). The district court's *STME* decision is helpful because it correctly explains that a *known* disability is distinct from a disability merely regarded as such. *STME*, 309 F. Supp. 3d at 1213–15. In other words, there is a difference between a "known disability" upon which a claim for association discrimination can be based, and a "disability" that encompasses the "regarded as" prong. Champion cites to no caselaw showing that an association discrimination claim can derive from the "regarded as" prong of 42 U.S.C. § 12102(1).

Even if the Court assumes Champion's theory—that an association discrimination claim can derive from an association with a person merely regarded as disabled—is correct, Champion alleges no facts that show Mannington regarded Evans as "disabled." Just because Mannington followed the relevant public health guidance when it sent Evans home from work due to his possible COVID-19 infection and

required him to stay home for an unspecified period of time does not mean Mannington regarded him as disabled. To hold otherwise would mean that every person in the United States who was (or who may be) sent home upon feeling sick during this pandemic, or was asked to stay home once testing positive or being exposed to COVID-19, would be disabled for the purposes of the ADA and every such employer covered by the ADA potentially liable. The Court soundly and easily rejects this position. Just because Evans stayed home after testing positive for COVID-19, as did millions of other Americans, does not mean that Mannington regarded him as disabled, or more importantly, discriminated against Champion because she was associated with him.

## CONCLUSION

Therefore, since Champion fails to sufficiently allege that Evans is disabled in her complaint, she fails to state a claim of discrimination based on her association with him. Accordingly, Mannington's Motion to Dismiss [Doc. 4] is **GRANTED**, and Champion's complaint [Doc. 1] is **DISMISSED**. The Clerk of Court may enter **JUDGMENT** against Champion and terminate the case.

**SO ORDERED**, this 10th day of May, 2021.

S/Tilman E. Self, III
**TILMAN E. SELF, III, JUDGE**
**UNITED STATES DISTRICT COURT**